DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN


|  |  |
|---|---|
| LEONISE GREIG-POWELL,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | Civil No. 2017-42 |
| v.      ) | |
| ) | |
| LIAT (1974) LTD.,      ) | |
| ) | |
| Defendant.      ) | |
| ) | |

ATTORNEYS:

**Clive Claudius Rivers**
Law Offices of Clive Rivers
St. Thomas, VI
    *For the plaintiff Leonise Greig-Powell*

**Christopher Allen Kroblin**
**Aysha R. Gregory**
Kellerhals Ferguson Kroblin PLLC
St. Thomas, VI
    *For the defendant LIAT (1974) Ltd.*

## MEMORANDUM OPINION

GÓMEZ, J.

    Before the Court is the motion of LIAT (1974) Ltd. for summary judgment.

### FACTUAL AND PROCEDURAL HISTORY

    Leonise Greig-Powell ("Greig-Powell") is a resident of St. Thomas, U.S. Virgin Islands.

LIAT (1974) Ltd. ("LIAT") is a foreign corporation incorporated under the laws of Antigua and Barbuda with its principal place of business in Antigua. LIAT is a regional airline that offers flights between destinations in the Caribbean.

On August 16, 2016, Greig-Powell was scheduled to travel from St. Thomas to Trinidad with LIAT. Greig-Powell's itinerary included a layover in Antigua after departure from St. Thomas. From Antigua, Greig-Powell was scheduled to travel on a connecting LIAT flight to Trinidad. Greig-Powell alleges she missed her connecting flight from Antigua to Trinidad because the flight from St. Thomas to Antigua was delayed. LIAT placed Greig-Powell on the next available flight from Antigua to Trinidad.[1]

Greig-Powell boarded that flight. Before taking off from Antigua, Greig-Powell raised concerns regarding the plane's estimated arrival time in Trinidad. Greig-Powell informed a LIAT employee that she needed to get to Trinidad by a certain time in order to have food to take her medication. In response, LIAT offered Greig-Powell an overnight accommodation in Antigua with

---

[1] The flight from Antigua to Trinidad had the following connecting stops: 1) Guadeloupe; 2) Dominica; 3) Barbados; and 4) Grenada.

a flight to Trinidad the following day. Greig-Powell refused the offer.

Later that day, while on a connecting flight, Greig-Powell alleges that she informed a flight attendant that she was diabetic and felt unwell. Greig-Powell further alleges that she informed the flight attendant that she required food to take her medication. The flight attendant informed Greig-Powell that there was no food on the plane. Sometime thereafter, Greig-Powell lost consciousness and struck her head on the seat of the plane.

On May 17, 2017, Greig-Powell brought a complaint for personal injury against LIAT in the Superior Court of the Virgin Islands. LIAT filed an answer to the complaint. Thereafter, LIAT removed the action to this Court. LIAT now moves for summary judgment.

## **DISCUSSION**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 ("Rule 56") if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986).

The movant has the initial burden of showing there is no genuine issue of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3rd Cir. 1985). The non-moving party "may not rest upon mere allegations, general denials, or ... vague statements...." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making this determination, this Court draws all reasonable inferences in favor of the non-moving party. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 850 (2002); *see also Armbruster Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Further,

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial. The
moving party is "entitled to a judgment as a matter of
law" because the nonmoving party has failed to make a
sufficient showing on an essential element of her case
with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As such,

"[w]hen the non-moving party bears the burden of persuasion at

trial, the moving party may meet its burden on summary judgment

by showing that the non-moving party's evidence is insufficient

to carry its burden of persuasion at trial." *Brewer v. Quaker*

*State Oil Refining Corp.*, 72 F.3d 326, 329 (3d Cir. 1995)

(citing *Celotex*, 477 US at 322-23)).

## ANALYSIS

Because Greig-Powell's claim arises from injuries sustained

on a round-trip flight from St. Thomas, United States Virgin

Islands--"a single State Party"--with an agreed stopping place

in Trinidad--"another State"--the Montreal Convention applies.

*See e.g.*, *Blake v. Am. Airlines, Inc.*, 245 F.3d 1213, 1215 (11th

Cir. 2001) (finding that a round-trip flight from Jamaica with

an agreed stopping place in another State qualified as

international transportation if Jamaica was party to the

Convention).

In order to sustain a claim under Article 17 of the

Montreal Convention, a claimant must establish the following

elements: (1) that there has been an accident; (2) that the

accident caused the passenger's injuries; and (3) that the

accident occurred while on board the aircraft or in the course

of embarking or disembarking the aircraft. *See E. Airlines, Inc.*

*v. Floyd*, 499 U.S. 530, 535-36 (1991).

In its motion for summary judgment, LIAT does not take

issue with the facts alleged by Greig-Powell. Rather, in support

of its motion, LIAT argues that Greig-Powell has failed to

allege any facts that constitute an accident. To assess LIAT's

argument, a brief review of the controlling law with respect to

personal injury on board an aircraft is necessary.

It is well settled that "recovery for a personal injury

suffered on board an aircraft or in the course of any of the

operations of embarking or disembarking" in foreign territory is

governed exclusively by the Montreal Convention and its

predecessor, the Warsaw Convention. *El Al Isr. Airlines v. Tsui*

*Yuan Tseng*, 525 U.S. 155, 161, 174 (1999) (noting that Montreal

Protocol No. 4, which had been ratified by the time *El Al* was

decided, "merely clarifie[d], it d[id] not alter, the [Warsaw]

Convention's rule of exclusivity."); *see also Acevedo-Reinoso v.*

*Iberia Lineas Aereas De Espana S.A.*, 449 F.3d 7, 11 (1st Cir.

2006). To ensure "the uniform regulation of international air

carrier liability," the Warsaw Convention was regarded as the

exclusive remedy for an aggrieved traveler against a foreign

airline. *El Al*, 525 U.S. at 161 ("[R]ecovery for a personal

injury suffered on board an aircraft or in the course of any of

the operations of embarking or disembarking, if not allowed

under the Convention, is not available at all") (alterations

omitted) (citations omitted) (internal quotation marks omitted).

The Convention for the Unification of Certain Rules

Relating to International Carriage by Air (referred to herein as

the "Warsaw Convention") is a multilateral treaty that sets

forth certain rules and regulations with respect to the

liability of aircraft carriers and the rights of passengers

involved in international commercial air travel.[2] The United

States became a party to the Warsaw Convention upon ratification

by the United States Senate on June 15, 1934. *See* 78 Cong. Rec.

S11582 (1934). In an effort to further improve uniformity among

and between countries with respect to air carriage, members of

the international community convened and drafted the Convention

for the Unification of Certain Rules for International Carriage

---

[2] *See* Multilateral Convention and Additional Protocol between the United
States and Other Powers Relating to International Air Transportation,
Concluded at Warsaw, October 12, 1929; Proclaimed October 29, 1934, *reprinted
at* 49 Stat. 3000 et seq.

by Air (referred to herein as the "Montreal Convention" or

"MC").

The Montreal Convention is a multilateral treaty governing

the international air carriage of passengers, baggage, and

cargo.[3] The Montreal Convention superseded the Warsaw

Convention.[4] The United States became a party to the Montreal

Convention upon ratification by the United States Senate on July

31, 2003. *See* 149 Cong. Rec. S10870 (daily ed. July 31, 2003);

*see also* List of Signatories to the Montreal Convention,

maintained by the United Nations International Civil Aviation

Organization, available at

https://www.icao.int/secretariat/legal/List%20of%20Parties/Mtl99

_EN.pdf (last visited September 19, 2018). On November 4, 2003,

the Montreal Convention entered into force. *See Ehrlich v. Am.*

*Airlines, Inc.*, 360 F.3d 366, 372 (2d Cir. 2004). Notably, the

Montreal Convention is self-executing and creates a private

right of action in U.S. courts.[5] The Montreal Convention covers

---

[3] *See* Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, ICAO Doc. 9740, S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000).

[4] *See* MC Art. 55(1) ("This Convention shall prevail over any rules which apply to international carriage by air: 1. between States Parties to this Convention by virtue of those States commonly being Party to (a) the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 …").

[5] "[A] treaty is 'equivalent to an act of the legislature,' and hence self-executing, when it "operates of itself without the aid of any legislative provision." *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829)). "Self-executing treaties are those that immediately create rights and duties of private individuals which

"all international carriage of persons, baggage or cargo

performed by aircraft for reward." MC Art. 1(1). Article 1(2) of

the Montreal Convention defines "international carriage" as:

> any carriage in which, according to the agreement between
> the parties, the place of departure and the place of
> destination, whether or not there be a break in the
> carriage or a transhipment, are situated either within the
> territories of two States [sic] Parties, or within the
> territory of a single State Party if there is an agreed
> stopping place within the territory of another State, even
> if that State is not a State Party.

MC Art. 1(2).

Liability for personal injury under the Montreal Convention

is governed by Article 17:

> The carrier is liable for damage sustained in case of death
> or bodily injury of a passenger upon condition only that
> the accident which caused the death or injury took place on
> board the aircraft or in the course of any of the
> operations of embarking or disembarking.

MC Art. 17(1).

---

are enforceable and are to be enforced by domestic tribunals." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 n.34 (2d Cir. 2003) (internal quotation marks, alterations, and citations omitted.). By contrast, "non-self-executing treaties require implementing action by the political branches of government or are otherwise unsuitable for judicial application." *Flores*, 414 F.3d at 257 n.34 (internal quotation marks, alterations, and citations omitted.) "An international agreement of the United States is 'non-self-executing' (a) if the agreement manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation, (b) if the Senate in giving consent to a treaty, or Congress by resolution, requires implementing legislation, or (c) if implementing legislation is constitutionally required." Restatement (Third) Of Foreign Relations Law § 111(4) (1987). The Senate Foreign Relations Committee's report on the Montreal Convention explicitly concluded that the treaty provides the basis for a private right of action in U.S. courts and that no separate implementing legislation was required. *See* S. Exec. Rep. 108-8, at 3, 6 (2003). *See also* 149 Cong. Rec. S10870 (daily ed. July 31, 2003) (statement of Sen. Biden).

Neither the Montreal Convention nor the Warsaw Convention define the term "accident."[6] However, the Supreme Court defined the term accident in the context of the Warsaw Convention in *Air France v. Saks*, 470 U.S. 392, 394-95 (1985). In that case, the plaintiff alleged that she suffered hearing loss following the plane's ordinary descent to its destination due to negligent maintenance and operation of the aircraft's pressurization system. *Id*. at 394. The airline moved for summary judgment on the ground that the passenger could not prove that her injury was caused by an "accident" within the meaning of the Warsaw Convention. *Id*. at 395. Because the Convention requires that an accident cause the alleged injury, the Court concluded that liability "arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger." *Id*. at 405. Thus, the Court concluded that an accident did not occur because the aircraft's pressurization system had operated in the usual manner. *Id*. at 395-96. The *Saks Court* noted that the definition of accident should be "flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id*. at 405. The Court further counseled

---

[6] The Explanatory Note to the Montreal Convention states that "it is expected" that the provision of Article 17 governing carrier liability for passenger injury and death will be "construed consistently with the precedent developed under the Warsaw Convention and its related instruments." S. Treaty Doc. No. 106-45, 1999 WL 33292734 at *16.

that, "[a]ny injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id*. at 406.

The Supreme Court reaffirmed that principle in *Olympic Airways v. Husain*, 540 U.S. 644 (2004). *Husain* involved an asthmatic passenger who was seated three rows away from the aircraft's smoking section. *Id*. at 646-47. After boarding the plane, Rubina Husain ("Husain") informed a flight attendant that her husband, Abid M. Hanson ("Hanson"), must be moved to a new seat. *Id*. at 647. The flight attendant denied Husain's request. *Id*. Prior to takeoff, Husain asked a second time and explained that Hanson was "allergic to smoke." *Id*. The flight attendant again refused to reseat Hanson. *Id*. Shortly after takeoff, passengers in the smoking section began to smoke. Husain asked a third and final time that Hanson be reseated. *Id*. The flight attendant refused to provide any assistance and falsely stated that the flight was full. *Id*. Approximately two hours into the flight, Hanson went to the front of the plane to get fresher air. *Id*. Shortly thereafter, Hanson suffered an asthma attack. *Id*. Despite receiving two shots of epinephrine, CPR, and oxygen by an allergist traveling with him, Hanson died as a result of the asthma attack. *Id*.

The Court held that the flight attendant's refusal to help Hanson avoid exposure to cigarette smoke in the cabin qualified as an accident. The Court also held that an accident had occurred because "the carrier's unusual and unexpected refusal to assist a passenger [by moving his seat] is a link in a chain of causation resulting in a passenger's pre-existing medical condition being aggravated by exposure to a normal condition in the aircraft cabin." *Id*. at 646. The *Husain* Court noted that, in the Court of Appeals, the petitioner did not challenge the District Court's finding that the flight attendant's conduct was unusual or unexpected in light of the relevant industry standard or petitioner's own company policy. *Id*. at 652. Thus, the Court assumed the flight attendant's conduct qualified as "unusual or unexpected" *Id*. at 653.

"In the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17." *Abramson v. Japan Airlines Co.*, 739 F.2d 130, 133 (3d Cir. 1984). "[E]ven a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 'accident.'" *White v. Emirates Airlines, Inc.*, 493 F. App'x 526, 531 (5th Cir. 2012). The inquiry for purposes of the Montreal Convention, is

not whether an airline failed to adhere to industry standards or
its own internal policies, but whether any such failure
constitutes an unexpected or unusual event or happening external
to the passenger. *White v. Emirates Airlines, Inc.*, 493 F. App'x
526, 534 (5th Cir. 2012); *see also Prescod v. AMR, Inc.*, 383
F.3d 861, 868 (9th Cir. 2004) (explaining that the seizure and
loss of a passenger's carry-on bag containing medical
necessities was an unusual or unexpected event because "[w]hile
baggage removal and delivery delays are routine in air travel,
the atypical aspect of this case was the promises made by
defendants' employees that the bag would not be taken from
Neischer and would not be delayed").

In *Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177 (5th
Cir. 2004), the airline did not add a deep vein thrombosis
warning to its pre-flight instructions, although many other air
carriers had. *Blansett*, 379 F.3d. at 178. Michael Blansett
("Blansett") suffered deep vein thrombosis on a transatlantic
flight resulting in a stroke that left him permanently
debilitated. *Id.* He sued under the Warsaw Convention, claiming
that the airline's failure to give the warning constituted an
"accident" under Article 17. *Id.* at 178-79. Recognizing that the
Supreme Court did not create "a *per se* rule that any departure
from an industry standard of care must be an 'accident,'" *id.* at

182, and finding that some airlines gave the warning and others did not, the Fifth Circuit held that "Continental's failure to warn of deep vein thrombosis was not an 'unusual or unexpected event' and not a qualifying 'accident.'" *Id.* at 182. *See also Caman v. Cont'l Airlines*, Inc., 455 F.3d 1087, 1092 (9th Cir. 2006) (explaining that "Continental's failure to warn Caman of DVT is not an 'event' as that term is discussed in *Saks* and *Husain* . . . [r]ather, Continental's failure to warn was an act of omission (inaction that idly allows an unfolding series of events to reach their natural conclusion) as opposed to an act of commission (inaction that produces an effect, result or consequence) as in Husain's rejection of a direct plea for help").

In *Nguyen v. Korean Air Lines Co.*, 807 F.3d 133 (5th Cir. 2015), Tinh Thi Nguyen ("Nguyen") flew from Vietnam to Korea to Texas on Korean Air. *Nguyen*, 807 F.3d at 135. Nguyen arranged for Korean Air to provide wheelchair service once she arrived in Texas. *Id.* Per Korean Air's policy, an announcement prior to landing in Texas was made in Korean and English stating Korean Air's wheelchair policy, advising wheelchair passengers to deplane last, and confirming wheelchair requests. *Id.* Nguyen spoke only Vietnamese. *Id.* Upon landing, Nguyen deplaned with her row and walked past a row of wheelchairs and wheelchair

attendants without indicating she desired a wheelchair. *Id.* When Nguyen reached an escalator, she fell and was seriously injured. *Id.* Subsequently, Nguyen sued Korean Air for her injuries under the Warsaw Convention. *Id.* The district court granted summary judgment to Korean Air and Nguyen appealed. *Id.* at 136.

The Fifth Circuit affirmed. *Id.* at 140. Distinguishing the "rejection of an explicit request for assistance," 540 U.S. 655, in *Husain*, the Fifth Circuit explained that "the record [was] clear that Korean Air never refused Nguyen a wheelchair." *Nguyen*, 807 F.3d at 137. Additionally, the Fifth Circuit agreed with the district court that "Nguyen has not produced any evidence suggesting that Korean Air's employees . . . deviated in any way from their internal policies and procedures or from industry standards in failing to ensure that she disembarked in a wheelchair." *Id.* at 138 (internal quotation marks omitted).

In support of its motion, LIAT directs the Court to its policy related to in-flight food. LIAT also directs the Court to excerpts from the depositions of Greig-Powell and Amethyst Phipps-Daley ("Daley"), a LIAT flight attendant on board the flight from Antigua to Trinidad. *See* Statement of Undisputed Facts Exhibit A, ECF No. 44-1; Exhibit E, ECF No. 44-5. Greig-Powell's deposition testimony and Daley's deposition testimony

outline the sequence of events that took place leading up to

Greig-Powell's injury.

With respect to its policy related to in-flight food, LIAT

proffered the deposition testimony of Sonya John ("John"),

LIAT's Executive Manager of Airports and Customer Service. In

her deposition testimony, John outlined LIAT's policy.

Q: Do you normally offer food onboard the aircraft?

A: No, we do not.

Q: Is that a policy?

A: It is.

Q: Is that a written policy?

A: Yes.

. . .

Q: So back in 2016, the policy is that you do not offer
food onboard the flight?

A: That's correct.

Q: So even if Ms. Greig-Powell had asked for it, you
could not have given it; is that what you're saying?

A: During flight, correct. Yes.

Q: Can you clarify something. What do you mean by "during
flight"?

A: I just want to confirm the phase of flight you're
referring to.

Q: Well, is there a time Liat offers food?

A: No.

> Q: What do you mean by "during flight"? Does that make
> a difference?
>
> A: Well, if something were to happen exceptionally on
> the ground, we would be able to get food on the ground.
>
> Q: Okay. So on the ground, but not inflight?
>
> A: Because there's no food onboard the plane inflight.

*See* Statement of Undisputed Facts Exhibit C at 63:20-65:4,

ECF No. 44-3.

While on the ground in Antigua, Greig-Powell became aware

that her new flight would not arrive in Trinidad until later

than her originally booked flight.

> Q: And can you tell me what happened once you got on the
> plane in St. Thomas?
>
> A: When I got on the plane in St. Thomas, we left, and
> we landed in Antigua.
>
> When the plane landed in Antigua, a guy was to the bottom
> of the stairs. I came off the plane. He took me on the
> wheelchair, and took me to another plane, which I thought
> that was the flight for me to go in to Trinidad, which,
> I was told that I would reach in Trinidad 8:00 o'clock.
>
> While I board the plane, I overheard passengers on the
> plane speaking about what time we would land.
>
> Well, it had a big argument on the plane about the time
> the plane would land and everything, which, it drew my
> attention.

*See* Statement of Undisputed Facts Exhibit A at 10:10-25,

ECF No. 44-1. As a result, Greig-Powell expressed concern to a

LIAT flight attendant that she needed to be in Trinidad in time

to get food to take her medication.

> A: I called the air attendant -- air hostess. I called
> the air hostess, and I asked her what time this plane is
> going to reach Trinidad. She said, "Well, we have a
> delay." And she giving me a story.
>
> I say, "Well, I am a diabetic, and I have to meet
> Trinidad in time that I could have my medication taken.
> I have to eat before I take my medication." Which, I was
> concerned, and I was arguing about it.

*See* Statement of Undisputed Facts Exhibit A at 11:1-8,

ECF No. 44-1.

Faced with Greig-Powell's urgent desire to have food prior

to taking medication, LIAT extended accommodations consistent

with the policy outlined by John. According to Daley, LIAT

offered Greig-Powell an overnight accommodation and meal in

Antigua with a flight to Trinidad the following day.

> Q: After she passed out, you offered her if she wanted
> to stay in Grenada?
>
> A: No, sir. Starting from Antigua, when she didn't want
> to continue, I called the agent to come to the aircraft,
> and I explained to them what was happening; Ms. Powell
> does not want to continue because she says the flight is
> too many stops. And I said to them, "Perhaps" – you know,
> "maybe we could take her off, put her up in a hotel, get
> her something to eat, a meal, rest, and continue." We
> did that in Antigua.
>
> And they went to her and spoke to her.
>
> And I myself encouraged her. I said, you know, "You'll
> be better rested. You'll get a meal, place to rest. And

then you can continue tomorrow? We can make the
phonecall." I offered that in Antigua.

*See* Statement of Undisputed Facts Exhibit E at 57:2-17,

ECF No. 44-5. Greig-Powell refused the offer.

In the wake of Greig-Powell refusing LIAT's accommodations,

the flight continued on its way to Trinidad. The itinerary

required several stops before arriving in Trinidad. The last

stop before the plane was to reach Trinidad was in Grenada.

Prior to arriving in Grenada, Greig-Powell asked Daley for food.

Daley told Greig-Powell that there was no food on the flight

which Daley could offer.

Q: Did Ms. Greig-Powell ask you for anything to eat?

A: Yes

Q: And did you give her something to eat?

A: No. We do not offer meals on Liat flights.

Q: Did you tell her that?

A: I did.

*See* Statement of Undisputed Facts Exhibit E at 24:12-19,

ECF No. 44-5. Subsequently, Greig-Powell lost consciousness and

sustained injuries.

While the Supreme Court has not announced "a *per se* rule

that any departure from an industry standard of care must be an

'accident,'" *Blansett*, 379 F.3d at 182, deviation from internal

policy or industry standard could constitute "an unexpected or

unusual event or happening," *Saks*, 470 U.S. at 405, that is an

accident. Here, the record indicates that LIAT had an internal

policy not to provide any food on its flights. *See* Statement of

Undisputed Facts Exhibit C at 63:20-65:4, ECF No. 44-3;

Statement of Undisputed Facts Exhibit E at 24:12-19,

ECF No. 44-5. While the existence of such a policy was not

shared with Greig-Powell prior to taking off from Antigua, the

offer to provide Greig-Powell with a meal and overnight

accommodations was. Considering the totality of the

circumstances, Greig-Powell reasonably should have been aware

that an overnight accommodation option was provided because the

option of receiving food on the plane was unavailable.

Essentially, Greig-Powell seeks to benefit and hold others

accountable after she placed herself in a position of peril or

risk--that is, continuing on an extended journey with no

guarantee of food--when she did not have to experience such

risk.

For liability to attach, the Supreme Court requires that a

passenger's injury be "caused by an unexpected or unusual event

or happening that is external to the passenger." *Saks*, 470 U.S.

at 405. It is difficult to reconcile: (1) a claim that LIAT's

inability to provide food on the flight was unexpected or

unusual with (2) LIAT's communications with Greig-Powell in

Antigua. It is even more difficult to reconcile such a claim
with Greig-Powell's conduct, including her refusal before she
was airborne, of a meal, overnight accommodations, and a
different flight at LIAT's expense. In light of these
circumstances, LIAT has carried its burden by demonstrating that
an accident within the meaning of the Montreal Convention did
not occur as a matter of law.

The facts presented by LIAT, if uncontroverted, would
entitle LIAT to judgment in its favor as a matter of law. As
such, the burden shifts to Greig-Powell to provide evidence
showing a genuine dispute of material fact or that LIAT is not
entitled to judgment as a matter of law.

In her opposition, Greig-Powell offers no evidence. Rather,
Greig-Powell merely argues that LIAT should have done more to
prevent her injuries. Where, as here, a movant has met its
initial burden on summary judgment, the opponent is obligated to
establish specific facts showing there is a genuine issue for
trial in order to overcome the movant's evidence and avoid
summary judgment. *Gans v. Mundy*, 762 F.2d 338, 342 (3rd Cir.
1985). "A statement in a brief or in oral argument does not
constitute evidence" for purposes of summary judgment. *Thornton
v. United States*, 493 F.2d 164, 167 (3d Cir. 1974).
Consequently, Greig-Powell has failed to adduce any evidence

tending to show that there is a genuine dispute as to any material fact.

Because LIAT has shown that there is no genuine dispute of material fact, and LIAT is entitled to judgment as a matter of law, summary judgment in LIAT's favor is appropriate.

An appropriate Judgment follows.